<u>IN THE UNITED STATES DISTRICT COURT</u>
<u>FOR THE EASTERN DISTRICT OF PENNSYLVANIA</u>

DERRICK ASKEW,                          )
                                        )    Civil Action
            Plaintiff                   )    No. 11-cv-04003
                                        )
        v.                              )
                                        )
R.L. REPPERT, INC.;                     )
RICHARD L. REPPERT;                     )
R.L. REPPERT, INC. EMPLOYEES            )
  PROFIT SHARING 401(k) PLAN; and       )
R.L. REPPERT, INC. MONEY                )
  PURCHASE PLAN (DAVIS BACON PLAN),     )
                                        )
            Defendants                  )

                         *      *      *

R.L. REPPERT, INC.;                     )
RICHARD L. REPPERT;                     )
R.L. REPPERT, INC. EMPLOYEES            )
  PROFIT SHARING 401(k) PLAN; and       )
R.L. REPPERT, INC. MONEY                )
  PURCHASE PLAN (DAVIS BACON PLAN),     )
                                        )
            Third-Party Plaintiffs      )
                                        )
        v.                              )
                                        )
CALIFORNIA PENSION ADMINISTRATORS &     )
  CONSULTANTS, INC.,                    )
                                        )
            Third-Party Defendants      )

APPEARANCES:

        KENT G. CPREK, ESQUIRE
        JAMES E. GOODLEY, ESQUIRE
            On behalf of Plaintiff

        WALTER H. FLAMM, JR., ESQUIRE
        CHRISTOPHER M. CURCI, ESQUIRE
            On behalf of Defendants and
            Third-Party Plaintiffs

        DANIEL S. STRICK, ESQUIRE
            On behalf of Third-Party Defendant

## **A D J U D I C A T I O N**

JAMES KNOLL GARDNER
United States District Judge

        I presided over a three-day non-jury trial in this matter on February 29, 2016 and March 1 and 2, 2016.  On May 6, 2016, the parties filed their post-trial proposed findings of fact and conclusions of law.

        Following my decisions on the parties' motions for summary judgment, the issues raised at trial which remain for adjudication include, with respect to plaintiff's Class Action Complaint:

        Count One:  (1) whether defendant R.L. Reppert, Inc. ("Reppert, Inc.") is liable under 29 U.S.C. §§ 1024(b)(4) and 1132(c)(1) for any failure to produce other custodial agreements for the R.L. Reppert, Inc. Employees Profit Sharing 401(k) Plan ("401(k) Plan") (apart from the custodial agreement with Nationwide Trust Company, FSB) and (2) what penalties, if any,

should be imposed for defendant Reppert, Inc.'s failure to timely produce plan documents for the periods December 6, 2008 to October 2, 2009 and May 17, 2012 to January 1, 2015.[1]

Count Four:  whether defendant Reppert, Inc. was required by 29 U.S.C. § 1023(a)(3)(A) and failed to engage an independent qualified public accountant to conduct an audit of the 401(k) Plan for plan years 2008 through 2011.

The issues raised at trial which remain for adjudication also include, with respect to defendants and third-party plaintiffs' Amended Third Party Complaint:

Count One:  whether third-party defendant California Pension Administrators & Consultants, Inc. ("CalPac") breached its contract with defendant and third-party plaintiff Reppert, Inc. to provide plan administration and recordkeeping services for the 401(k) Plan.

Count Two:  whether CalPac, either knowingly or recklessly, misrepresented the nature of its plan administration and recordkeeping services to third-party plaintiff Reppert, Inc.

---

[1]    As explained below, by Order and Opinion dated February 4, 2016 and filed February 5, 2016 (Documents 132 and 133), I granted plaintiff summary judgment on the question of liability (but not penalties) for (a) defendant Reppert, Inc.'s failure to provide plan documents for the 401(k) Plan within thirty days of plaintiff's written request for the period December 6, 2008 to October 2, 2009 and for (b) defendant's failure to produce its custodial agreement with Nationwide Trust Company, FSB for the period May 17, 2012 to January 1, 2015.  See below at pages 33-34.

## SUMMARY OF DECISION

Regarding Count One of plaintiff's Class Action Complaint, I find that defendant Reppert, Inc. is not liable under 29 U.S.C. § 1132(c)(1) for any failure to produce any other custodial agreements for the 401(k) Plan (apart from the custodial agreement with Nationwide Trust Company, FSB).

However, I impose on defendant Reppert, Inc. a document penalty of $15,959.00 for its failure to timely produce plan documents for the period December 6, 2008 to October 2, 2009 and for its failure to timely produce its custodial agreement with the Nationwide Trust Company, FSB for the period May 17, 2012 to January 1, 2015.

Regarding Count Four of plaintiff's Class Action Complaint, I conclude that defendant Reppert, Inc. failed to engage an independent qualified public accountant to conduct an audit of the 401(k) Plan for plan years 2008 through 2011 as required by 29 U.S.C. § 1023(a)(3)(A).  In particular, I find that the 401(k) Plan did not qualify for an audit exemption for those years, because it had more than 120 participants at the beginning of the 2008 plan year and was thus not permitted to file a simplified annual report.

Regarding Count One of defendants' and third-party plaintiffs' Amended Third Party Complaint, I conclude that defendants and third-party plaintiffs have failed to prove by a

-4-

preponderance of the evidence that third-party defendant CalPac breached its contract with defendant and third-party plaintiff Reppert, Inc. to provide plan administration and recordkeeping services for the 401(k) Plan.

Regarding Count Two of defendants' and third-party plaintiffs' Amended Third Party Complaint, I conclude that defendants and third-party plaintiffs have failed to prove by a preponderance of the evidence that third-party defendant CalPac, either knowingly or recklessly, misrepresented the nature of its plan administration and recordkeeping services to third-party plaintiff Reppert, Inc.

## JURISDICTION

This court has original jurisdiction over the subject matter of plaintiff's claims under 29 U.S.C. §§ 1024, 1132 and various other provisions of the Employee Retirement Income Security Act of 1974 ("ERISA")[2] pursuant to 28 U.S.C. § 1331. This court has supplemental jurisdiction over defendants and third party plaintiffs' state law claims of breach of contract, fraud and misrepresentation pursuant to 28 U.S.C. § 1367(a).

## VENUE

Venue is proper pursuant to 28 U.S.C. § 1391(b) because defendants reside in, and a substantial part of the

---

[2]     Codified at 29 U.S.C. §§ 1001-1461.

events giving rise to this action occurred in, Emmaus, Lehigh County, Pennsylvania, which is located within this judicial district.

## **PROCEDURAL HISTORY**

On June 17, 2011 plaintiff filed a six-count Class Action Complaint (Document 1).[3]  Count One alleged violations of ERISA document production requirements under, among other sections, 29 U.S.C. § 1024(b)(4) and sought statutory penalties pursuant to 29 U.S.C. § 1132(c)(2) against Reppert, Inc. as plan administrator.

Count Two averred the same violations as Count One and sought injunctive relief to compel defendants Reppert, Inc. and Richard L. Reppert to satisfy their statutory document production obligations under ERISA.

Count Three asserted that defendants Reppert, Inc. and Richard L. Reppert failed to establish a trust in violation of 29 U.S.C. § 1103.

Count Four alleged that defendants Reppert, Inc. and Mr. Reppert breached their fiduciary duties in violation of 29 U.S.C. § 1104, by among other things, failing to document, disclose and report on the 401(k) Plan in accordance with ERISA.

---

[3]    Plaintiff did not move for class certification until February 26, 2016.  By Order dated and filed February 29, 2016 (Document 145), I denied plaintiff's belated class certification motion as untimely and because plaintiff had previously represented to the court that he would not seek class certification in this case.

Count Five averred that defendants Reppert, Inc. and Mr. Reppert conducted prohibited transactions in violation of 29 U.S.C. § 1106.

Finally, Count Six alleged that defendants denied benefits owed to plaintiff and seeks a declaration of benefits.

On September 15, 2011 defendants filed a Third Party Complaint against CalPac (Document 18), seeking to hold it liable for contribution and indemnity to the extent that the defendants themselves were found liable to plaintiff.

On November 14, 2011 CalPac filed a motion to dismiss the Third Party Complaint (Document 34).  On September 28, 2012 I granted that motion (Documents 40 and 41).  Subsequently, on October 31, 2012 defendants filed a three-count Amended Third Party Complaint against CalPac (Document 42).

Count One of the Amended Third Party Complaint alleged that CalPac breached its contract with defendants to administer the Reppert plans.

Count Two averred that CalPac knowingly or recklessly misrepresented the administration and recordkeeping services it would provide.

Count Three asserted that CalPac was a co-fiduciary with defendants and sought contribution and indemnity from CalPac to the extent defendants were liable to plaintiff Askew.

On November 14, 2012 CalPac filed a second motion to dismiss (Document 44), and on September 30, 2013 I granted that motion regarding Count Three only (Document 51).

On April 10, 2015, after extensive discovery had been conducted in this case, plaintiff moved for partial summary judgment (Document 73) on Counts One and Four of his Class Action Complaint.  Subsequently, on July 31, 2015 defendants filed their own motion for summary judgment (Document 90) against plaintiff on all counts of plaintiff's Class Action Complaint.

Simultaneously, third-party defendant CalPac moved for summary judgment (Document 89) against defendants and third-party plaintiffs on both counts of their Amended Third Party Complaint.

By Order dated November 13, 2015 and filed November 17, 2015 (Document 118), I denied third-party defendant's motion for summary judgment.

By Order dated February 4, 2016 and filed February 5, 2016 (Document 133), I granted plaintiff's motion for partial summary judgment in part and denied it in part.  Specifically, I granted plaintiff summary judgment regarding liability (but not damages) on that part of Count One of his Class Action Complaint alleging that defendant R.L. Reppert, Inc. failed to provide plan documents for the 401(k) Plan in a timely manner and for

-8-

its failure to produce its custodial agreement with Nationwide Trust Company, FSB.  I denied plaintiff summary judgment in all other respects.

In that Order, I also granted defendants' motion for summary judgment in part and denied it in part.

I granted summary judgment in favor of defendants on that part of plaintiff's Class Action Complaint alleging defendant R.L. Reppert, Inc.'s failure to provide plan documents for the R.L. Reppert, Inc. Money Purchase Plan (Davis Bacon Plan) and that part of Count One alleging R.L. Reppert, Inc.'s failure to produce trust agreements, periodic benefits statements, notice of vested deferred benefits, disclosure of financial reports, Section 404(c) disclosures, notice of qualified default investment, notice of availability of investment advice and depository documents for the R.L. Reppert, Inc. Employees Profit Sharing 401(k) Plan.[4]

I also granted summary judgment in favor of defendants on that part of plaintiff's Class Action Complaint alleging R.L. Reppert, Inc.'s failure to conduct audits of the R.L. Reppert, Inc. Money Purchase Plan (Davis Bacon Plan) as well as on Counts Two, Three, Five and Six of plaintiff's Class Action Complaint.

---

[4]     I refer to these documents or categories of documents by the titles and terms that plaintiff himself uses.  See Opinion dated February 4, 2016 and filed February 5, 2016 at pages 13-14 (Document 132).

I denied summary judgment for defendants on that part of Count One of plaintiff's Class Action Complaint on which I granted plaintiff's motion for partial summary judgment and that part of Count One regarding the custodial agreements other than the Nationwide Trust Company, FSB agreement.  I also denied summary judgment for defendants on Count Four.

On February 19, 2016 plaintiff moved for reconsideration of my February 4, 2016 Order and Opinion (Document 134).

On February 26, 2016 I denied plaintiff's motion for reconsideration (Documents 141 and 142).

Also on February 26, 2016, plaintiff moved for class certification (Document 143).  I denied that motion on February 29, 2016 (Document 145), immediately prior to the commencement of the three-day non-jury trial in this matter.

### <u>FINDINGS OF FACT</u>[5]

Based upon the testimony and evidence adduced at trial,[6] the pleadings, record papers and the parties' post-trial submissions, I make the following Findings of Fact.

---

[5]    My Findings of Fact incorporated the relevant facts agreed to by the parties as reflected in the Stipulated Findings of Facts and Conclusions of Law filed on November 16, 2015 (Document 113).

[6]    The Findings of Fact reflect my credibility determinations regarding the testimony and evidence presented at trial.  Credibility determinations are within my sole province as the finder of fact in this non-

<u>(Footnote 6 continued)</u>:

## Background

1.      Defendant R.L. Reppert, Inc. ("Reppert, Inc.") is a contractor which performs commercial drywall and ceiling work.  It is incorporated in Pennsylvania and has its principal office in the Eastern District of Pennsylvania.

2.      Some of the work performed by Reppert, Inc. is subject to the prevailing wage laws of the Commonwealth of Pennsylvania[7] and the State of New Jersey[8] relating to construction work for public entities as well as to the federal Davis-Bacon Act[9] and/or similar local laws.

3.      Prior to 2007, Reppert, Inc. adopted the R.L. Reppert, Inc. Employees Profit Sharing 401(k) Plan ("401(k) Plan") to provide retirement and other benefits to eligible employees.  These benefits include fringe benefits contributions to meet prevailing wage obligations.

4.      Reppert, Inc. is the plan sponsor and plan administrator of the 401(k) Plan.

5.      Richard L. Reppert and Dianna L. Reppert own 75% of Reppert, Inc.

6.      Richard L. Reppert is the trustee for the plan.

---

(Continuation of footnote 6):

jury trial.  Fed.R.Civ.P. 52; see also Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 715, 106 S.Ct. 1527, 1530, 89 L.Ed.2d 739, 745 (1986). Implicit in my findings is the conclusion that I found the testimony of some witnesses credible in whole, some in part, and have rejected portions of testimony of certain witnesses, as more fully explained in my discussion.

At trial, the parties jointly submitted all potential trial exhibits (Exhibits 1 through 88).  No party submitted any other, individual exhibits.  Thus, in this Adjudication, all references to trial exhibits will utilize that joint numbering system.

I also note that some, but not all, of the 88 potential trial exhibits were offered and admitted into evidence.  Many were not, and others were objected to.  I rely only upon those trial exhibits admitted into evidence.

[7]      43 P.S. §§ 165-1 through 165-17.

[8]      N.J.S.A. §§ 34:11-56.25 through 56.70.

[9]      40 U.S.C. §§ 3141 through 3148.

7.    Dianna L. Reppert was in charge of payroll and benefits issues at Reppert, Inc.  She does not have any formal training or education with respect to employee benefits or ERISA.

8.    From June 1, 2000 to June 17, 2010 defendant Richard L. Reppert, on behalf of defendant Reppert, Inc., contracted with third-party defendant California Pension Administrators & Consultants, Inc. ("CalPac") to be the third-party administrator for the 401(k) Plan.

9.    During the period between 2000 and 2010, there were a few different custodians of plan assets for the 401(k) Plan.  However, the identities of those custodians and when they were custodians for the 401(k) Plan are not clear from the record.

10.   The custodian for the 401(k) Plan assets in 2007 and 2008 was a company called "Matrix" or "MG Trust".

11.   Since June 18, 2010, the custodian for the 401(k) Plan assets has been the Nationwide Trust Company, FSB.

12.   Plaintiff Derrick Askew worked for Reppert, Inc. from July 29, 2007 to August 31, 2008.

13.   Derrick Askew was enrolled in the 401(k) Plan and has been a plan participant since 2007.

14.   Derrick Askew received a copy of the Summary Plan Description for the 401(k) Plan five days prior to the start of his employment, on July 24, 2007.

15.   At some time prior to November 5, 2008, the local carpenters union introduced plaintiff Askew to his future counsel in this matter, Kent G. Cprek, Esquire of the firm Jennings Sigmond, P.C.

16.   Although the local carpenters union is not a party in this case, it is providing legal, accounting and financial support for Attorney Cprek and Jennings Sigmond's representation of plaintiff Askew, including paying for all of the attorney's fees.  Plaintiff Derrick Askew is not able to afford the costs of this litigation.

## Document Requests

17.   On November 5, 2008 Mr. Cprek sent a letter on behalf
of plaintiff to Reppert, Inc. as the plan administrator for
the 401(k) Plan requesting certain plan documents.

18.   The requested plan documents included, but were not
limited to, copies of the "Plan document", "the most recent
summary plan description for the Plan and any subsequent
summary of material modifications" and "any trust
agreement, custodial agreement or other document governing
the trust and custody of assets of the Plan or any
successor thereto."[10]

19.   Whenever Mr. Cprek and Jennings Sigmond receive
reports of contractors on prevailing wage jobs "whose
numbers appear to be too good to be possible and they have
. . . a Davis Bacon plan", they send a similar letter
requesting documents.[11]

20.   Upon receipt of the November 5, 2008 letter from
Attorney Cprek, Dianna Reppert forwarded a copy to counsel
for defendants, Walter H. Flamm, Jr., Esquire of the law
firm Flamm, Boroff & Bacine, P.C.,[12] and started to collect
and copy the requested documents.

21.   Attorney Flamm and Mr. Reppert believed that the
November 5, 2008 letter was at the prompting of the local
carpenters union, because they had numerous, previous
disputes with the union and Jennings Sigmond.

22.   Procuring and assembling the requested documents
required much time and effort, because Dianna Reppert and
other staff at Reppert, Inc. needed to interpret the
document request, find the files, and copy them.

---

[10]     Joint Trial Exhibit 1.

[11]     Notes of Testimony of the non-jury trial conducted on March 2,
2016 in Allentown, Pennsylvania, styled "Transcript of Non-Jury Trial – Day 3
of 3 Before the Honorable James Knoll Gardner[,] United States District
Judge" ("N.T. 3/2/2016") at page 92.

[12]     Flamm, Boroff & Bacine, P.C. was the name of defendants'
counsel's law firm at the time of the November 5, 2008 letter.  Its current
name is Flamm, Walton, Heimbach & Lamm, P.C.

23.  On December 1, 2008 Dianna Reppert sent a facsimile transmission to CalPac, attaching plaintiff's November 5, 2008 letter and requesting CalPac to send the listed documents to Reppert, Inc., to ensure that Reppert, Inc. had the most updated information.

24.  On December 1, 2008 Mr. Flamm sent Mr. Cprek a letter, explaining that many of the requested documents were in the possession of third-party administrator CalPac and that receipt of those documents from CalPac was taking longer than expected.

25.  On December 5, 2008 Mr. Flamm sent Mr. Cprek another letter, explaining that he was in possession of the requested documents and that the cost of procuring and assembling the documents was $1,800.00.  Mr. Flamm further stated that he would forward the requested documents as soon as that sum was paid.

26.  Later on December 5, 2008, Mr. Cprek responded by electronic mail ("email") to Mr. Flamm's letter, requesting Mr. Flamm to itemize the documents which produced a charge of $1,800.00 so that Mr. Cprek could identify the specific documents that plaintiff wanted.

27.  Mr. Flamm subsequently telephoned Mr. Cprek and left a message explaining how the $1,800.00 cost was calculated.

28.  Mr. Cprek did not receive that phone message.

29.  From December 5, 2008 to April 2, 2009, there were no further communications between plaintiff and defendants or between their counsel.

30.  On April 2, 2009 plaintiff filed a two-count complaint in this court, demanding production of the documents requested in the November 5, 2008 letter and statutory penalties against Reppert, Inc.[13]

---

[13]    Complaint, <u>Askew v. R.L. Reppert, Inc. et al.</u>, No. 09-cv-01446 (E.D.Pa. Apr. 2, 2009) (Document 1).

31.   On April 21, 2009 Mr. Flamm sent Mr. Cprek a letter, stating that he had called Mr. Cprek in response to Mr. Cprek's December 5, 2008 email explaining the costs of producing the requested documents.  Specifically, Mr. Flamm stated that the vast majority of the $1,800.00 figure was to account for the approximately 40 hours of labor (at $40.00 per hour) needed to prepare the documents, and that the balance was for copying charges.

32.   In Mr. Flamm's April 21, 2009 letter he also expressed surprise at the lawsuit, in light of his long history of amicable dealings with Jennings Sigmond.  Mr. Flamm believed that he was engaged in an ongoing dialogue with Mr. Cprek with respect to the document production. Mr. Flamm had expected, either in response to his December 5, 2008 call or otherwise, a response from Mr. Cprek before any lawsuit would be filed.

33.   Mr. Cprek responded to Mr. Flamm by email, stating that he did not have any record of any call or letter from Mr. Flamm other than his December 5, 2008 letter.

34.   Subsequently, Mr. Flamm spoke with Mr. Cprek by phone. On that phone call, Mr. Flamm told Mr. Cprek that he had the requested documents prepared.  Mr. Cprek then asked Mr. Flamm to send a list of the documents that Mr. Flamm had in his possession.

35.   On May 29, 2009 Mr. Flamm sent a letter to Mr. Cprek, listing the documents he had in his possession that he believed were responsive to plaintiff Askew's document request.  Mr. Flamm did not attach those documents, because he did not believe that Mr. Cprek was asking for them at that time.

36.   On July 9, 2009 Ms. Bridget E. Clarke, Esquire replied to Mr. Flamm's May 29, 2009 letter.  In her response, Ms. Clarke asked Mr. Flamm to confirm that the documents listed in his May 29, 2009 letter would be Reppert, Inc.'s complete response to plaintiff's November 5, 2008 document request.  Ms. Clarke also stated that the annual reports for the 401(k) Plan (or "Form 5500s")[14] should be included.

---

[14]     Annual reports filed with the Department of Labor are filed on a Department of Labor form called the Form 5500.

37.   On September 1, 2009 Mr. Flamm sent Ms. Clarke an email, informing her that he was in possession of the Form 5500s for plan years 2005 through 2007.  He then asked whether plaintiff Askew actually wanted to have him produce the listed documents and whether there were any additional documents that should be included.

38.   Ms. Clarke responded by email that she would be away from her office for several days and that she would get back in touch when she returned.

39.   Mr. Flamm and Ms. Clarke continued to communicate about what other documents that plaintiff wanted.

40.   On October 2, 2009 Mr. Flamm sent Ms. Clarke a letter, enclosing fourteen categories of documents.  Those documents included, but were not limited to, the summary annual report, the plan document, annual reports (Form 5500s), the summary plan description and the administrative policy regarding the claims procedure for the 401(k) Plan.  Again, Mr. Flamm concluded his letter by asking whether there was any additional information that plaintiff required.

41.   Shortly thereafter, on December 21, 2009, plaintiff Askew voluntarily dismissed his complaint "without prejudice".[15]

42.   After the December 21, 2009 dismissal, there were no further communications between plaintiff Askew and defendants or between their counsel until June 17, 2011.

43.   On June 17, 2011 plaintiff Askew filed the present lawsuit.

44.   During an initial conference in this case, United States Magistrate Judge Henry S. Perkin asked plaintiff Askew to provide a list detailing exactly which documents he believed he had requested but had not yet received and also the legal authority for each requested document.

---

[15]     Joint Stipulation to Dismiss, Askew v. R.L. Reppert, Inc. et al., No. 09-cv-01446 (E.D.Pa. Dec. 21, 2009) (Document 20).

45.   Pursuant to that request, on April 16, 2012, plaintiff produced a thirteen-page Reppert Benefit Plan Document Inventory ("Document Inventory") and sent it to defendants. The Document Inventory listed documents not only with respect to the 401(k) Plan but also with respect to other Reppert, Inc. benefits plans.

46.   With respect to the 401(k) Plan, the Document Inventory listed, among other documents, "Trust (Custodial) Agreement".[16]  The Document Inventory identified the legal authority for that request as being 29 U.S.C. § 1103 and commented that "[b]ooklet refers to Nationwide/California".[17]

47.   On August 24, 2012 plaintiff Askew propounded his first set of interrogatories and document requests on defendants.  Plaintiff's interrogatory 3.02(a) demanded that defendants explain why they did not produce any custodial agreements.  Plaintiff's document request 3.03 requested

> All documents, records, and summaries regarding deposits into the R.L. Reppert Inc. Employees Profit Sharing 401(k) Plan . . . during the Relevant Period for work on prevailing wage jobs, with detail on the amount (by week, month, or quarter or year as available) and the number of employees receiving a deposit into a plan account each year.[18]

48.   Defendant Reppert, Inc. did not provide plaintiff with any custodial agreements in response to either plaintiff's April 16, 2012 Document Inventory or his August 24, 2012 interrogatories and document requests.

49.   Defendant Reppert, Inc. did not do so, because it did not have any custodial agreements in its possession.

---

[16]   The Document Inventory identified eight categories of documents that plaintiff believed he had requested but not yet received.  In my February 4, 2016 Opinion, I determined that defendant Reppert, Inc. had either satisfied its document production obligations or did not have any obligations regarding all but one of those categories of documents -- namely, custodial agreements.  See Opinion dated February 4, 2016 and filed February 5, 2016 at pages 20-45.

[17]   Joint Trial Exhibit 13 at page J35.

[18]   Joint Trial Exhibit 14 at page J65.

50.   On October 14, 2013 plaintiff filed Plaintiff's Motion to Compel Defendants to Cooperate in Discovery ("First Motion to Compel"), seeking to compel the defendants to answer his interrogatories 3.12 through 3.16 and to produce documents responsive to his document requests 3.01 through 3.04.

51.   By Order dated and filed December 3, 2013, Magistrate Judge Perkin denied plaintiff's First Motion to Compel.

52.   Specifically, with respect to document requests 3.01 and 3.04, Judge Perkin determined that defendants had already produced all responsive documents in their possession.

53.   With respect to document requests 3.02 and 3.03 and interrogatories 3.12 through 3.16, Judge Perkin found the requested documents and information to be irrelevant because plaintiff failed to timely move for class certification.

54.   On December 13, 2013 plaintiff filed his Statement of Objections to Magistrate's Order of December 3, 2013.

55.   By Order dated and filed September 30, 2014, I sustained in part and overruled in part plaintiff's objections to Judge Perkin's December 3, 2013 Order.

56.   Specifically, I overruled plaintiff's objections with respect to document requests 3.01 and 3.04 and sustained his objections with respect to document requests 3.02 and 3.03 and interrogatories 3.12 through 3.16.  I ordered the defendants to comply with the discovery requests by October 31, 2014.

57.   On March 20, 2015 plaintiff filed Plaintiff's Second Motion to Compel Defendants to Cooperate in Discovery ("Second Motion to Compel"), seeking again to compel defendants to answer interrogatories 3.12 through 3.16 and document requests 3.02 and 3.03.

58.   By Order dated and filed April 10, 2015, Magistrate Judge Perkin denied plaintiff's Second Motion to Compel.

59.   On April 24, 2015 plaintiff filed his Statement of Objections to Magistrate's Order of April 10, 2015.

60.  By Order dated November 19, 2015 and filed November 20, 2015, I overruled plaintiff's objections to Judge Perkin's April 10, 2015 Order.

61.  Although defendants did not possess any custodial agreements, plaintiff was able to obtain, pursuant to a third-party subpoena, Reppert, Inc.'s custodial agreement with the Nationwide Trust Company, FSB ("Nationwide agreement").  Plaintiff received the Nationwide agreement in January of 2015.

62.  Plaintiff also discovered several other documents relating to a company named Gruntal & Co., L.L.C. ("Gruntal")  These documents include:

    a.  a Gruntal New Account Form for the "Richard L. Reppert 401K Retirement Plan FBO Richard L. Reppert – Smart Account DTD" ("New Account Form");

    b.  an Annex to Gruntal Client Agreement for Tier II and/or Tier III Full Service Brokerage Accounts for the 401(k) Plan ("Annex");

    c.  a Circle Trust Company TPA Connection New Account Form ("Circle Trust Form") for the 401(k) Plan; and

    d.  a Gruntal new employee benefit plan set-up form for the 401(k) Plan ("Gruntal Plan Application").[19]

63.  The New Account Form relates to a personal "custodial IRA" for Richard L. Reppert.  It lists Mr. Reppert's home address and spouse's name.  It also lists that he has two dependents.  It identifies his employer as Reppert, Inc. It uses the individual federal income tax rate brackets as opposed to the corporate income tax rate brackets in the "Financial Information" section.  It is dated February 15, 2001.

---

[19]  See Joint Trial Exhibit 55c.  There appear to be a number of other documents in Exhibit 55, but only those documents in part c, Bates numbers J2003 through J2010, were admitted into evidence.

    Where I cite or refer to "Jxxx", I refer to the Bates stamp pagination.  Bates stamping or Bates numbering refers to a system of placing numbers or other marks on legal documents to label and identify them.

64.  The Annex is one part of, and incorporates, a General Client Agreement between a participant under the 401(k) Plan, in this case Richard L. Reppert, and Gruntal.  The Annex serves as an acknowledgment by the participant of the risks, fees, and costs, among other information, of self-directing the "Gruntal Tier II and/or Tier III Self Directed Brokerage Account".  It is signed only by Richard L. Reppert as the participant and Richard L. Reppert as trustee for the 401(k) Plan.[20]  It is dated January 23, 2001.

65.  The Circle Trust Form is a form, signed by Richard L. Reppert as trustee for the 401(k) Plan and Mr. Larry Delhagen as a representative of Gruntal, to enroll and install the "TPA Connection platform".[21]  It is dated July 29, 2000.

66.  Finally, the Gruntal Plan Application is a form application to establish a temporary 401(k) Plan.[22]  The document is signed by Richard L. Reppert on behalf of Reppert, Inc. and dated August 2, 2000.

67.  Paragraph 10 of the Gruntal Plan Application states, in part, that "The Employer, by executing this Application, acknowledges that (i) it has read the Plan and the Custodial Agreement in their entirety".[23]

---

[20]    Neither the General Client Agreement nor any other annex or document associated with the general client agreement was admitted into evidence in this case.

[21]    It is not clear what the Circle Trust Company and "TPA Connection platform" are.

[22]    Substantial portions of the top, bottom and right side of this document are omitted.  For example, the title of the document is not present in the copy submitted nor is the signature of the representative for Gruntal.

[23]    Joint Trial Exhibit 55c at J2010.

68.   The first page of the Gruntal Plan Application bears a
handwritten note by Mr. Larry Delhagen that states, "[t]his
is an interim account to ACAT in assets from Legg Mason and
liquidate assets so cash can be . . . to Circle Trust to
establish . . . 401K Plan.  NO contributions will be made
to this."[24]

### Audit Requirement

69.   As the third-party administrator for the 401(k) Plan
between 2000 and 2010, CalPac provided recordkeeping
services for the 401(k) Plan and assisted Reppert, Inc. in
filing the appropriate annual informational returns to
government agencies, including the Form 5500 submitted to
the Department of Labor.

70.   Each week, Reppert, Inc. sent CalPac a spreadsheet
documenting for each employee the employee's contribution
to the 401(k) Plan, any contributions for prevailing wage
and any loans that the employee elected to take.

71.   That information is compiled and stored electronically
by CalPac.

72.   CalPac's software categorizes or "codes" employees
into several possible categories, including "active",
"terminated", "rehire", "terminated/paid out", or
"management account".  Once an employee has been coded to
have a particular status, he or she cannot be re-coded for
that year.

73.   Reppert, Inc. forwarded the monetary contributions to
the custodian of assets for the 401(k) Plan.

74.   After the end of every plan year, Reppert, Inc.
produced an employee census document, which listed for each
employee the employee's name, Social Security number, date
of birth, date(s) of hire, date(s) of termination, and
compensation for that year, among other information.[25]

---

[24]     Joint Trial Exhibit 55c at J2009 (emphasis in original).  As
noted above, parts of the right side of this handwritten note are cut-off and
unreadable.

[25]     No employee census document was submitted into evidence in this
case.

75.  Based on the employee census data, the employees'
account balances, the vesting schedules for each employee's
benefits, and the employees' termination dates (if
applicable), CalPac would prepare and complete the annual
report (Form 5500) for the 401(k) Plan.

76.  CalPac used software to generate a Summary Annual
Report for the 401(k) Plan based on the annual report
(Form 5500).

77.  Based on the same information listed above, CalPac
also worked with Reppert, Inc. to develop a recommendation
as to whether Reppert, Inc. should be audited or not.

78.  CalPac and Reppert, Inc. worked diligently to ensure
that the annual reports for the 401(k) Plan were completed
expeditiously and accurately.

79.  The Client Service Agreement between CalPac and
Reppert, Inc. states, in relevant part, that

> The Client understands that a vital part of
> CALPAC's services includes preparation of
> information returns . . . .  Returns are to be
> filed by the Client. . . .
>
> CALPAC assumes no responsibility for the accuracy
> and correctness of any records or data provided
> by the Client or the Client's agents and
> representatives.[26]  The Client assumes full
> responsibility for the accuracy and correctness
> of any records or data provided by the Client to
> CALPAC.  Such records and data include, but are
> not limited to, employee census data, trust
> accounting data, asset data and investment data.
>
> The Client agrees that CALPAC is not a provider
> of legal advice, tax advice, or investment
> advice.  The Client agrees to seek the advice of
> an attorney, accountant or other financial
> advisor for advice and counseling on legal issues
> or the suitability of an investment.  The Client
> agrees to verify any legal or investment advice

---

[26]  The "Client" referred to in this Client Services Agreement is
Reppert, Inc.  See Joint Trial Exhibit 19 at page 1.

which it may incidentally receive from CALPAC in
the course of servicing the Plan.  Such
verification is the responsibility of the Client,
and may include seeking the advice of an
attorney, accountant or financial advisor.[27]

80.  Reppert, Inc. adopted and submitted the Form 5500s and
Summary Annual Reports prepared by CalPac without
alteration.

81.  Similarly, Reppert, Inc. adhered to CalPac's
recommendation as to whether or not the 401(k) Plan
required an audit.

82.  Reppert, Inc. relied entirely on CalPac's prepared
forms and recommendations, because Reppert, Inc. believed
that it lacked the necessary information and expertise to
do otherwise.

83.  Prior to 2013, Reppert, Inc. did not engage an
independent qualified public accountant to conduct any
audits of the 401(k) Plan as part of its annual report
(Form 5500).

84.  Reppert, Inc. did not do so, because it believed that
the 401(k) Plan was entitled to an exemption from the audit
requirement, pursuant to 29 C.F.R. § 2520.104-46(b) for
each of the plan years before 2012.

85.  In addition to preparing the regulatory filings for
the 401(k) Plan, CalPac also prepared and sent out the
annual statements of benefits for current and former
participants in the plan.

86.  The annual statements of benefits reflect, for each
current or former participant, the value of his or her
account in the 401(k) Plan at the end of the plan year.

87.  For the plan year ending December 31, 2007, CalPac
produced 142 annual statements of benefits.[28]

88.  Of those 142 annual statements of benefits, 6 reflect
no ending balance for those individuals.

---

[27]   Id. at page 2.

[28]   See Joint Trial Exhibit 29.

89. Two other annual statements of benefits include no vested balances for those individuals.

90. Finally, five other annual statements of benefits indicate minimal ending balances, i.e. an ending balance that is a small fraction of the starting balance.

91. For the plan year ending December 31, 2008, CalPac produced 150 annual statements of benefits.[29]

92. Based on the annual statements of benefits for 2007 and 2008, 127 individuals with positive account balances at the end of 2007 continued to have positive account balances at the end of 2008.

93. As noted, some of the annual statements of benefits produced by CalPac reflect account balances of zero.

94. These zero-account balance statements indicate that the account holder is a terminated employee whose benefits have been paid out.

95. Other annual statements of benefits reflect negative account balances or very small account balances.

## CONCLUSIONS OF LAW

1. From at least 2007 to date, R.L. Reppert, Inc. was an employer in an industry or activity affecting commerce, within the meaning of 29 U.S.C. § 1002(12).

2. The R.L. Reppert, Inc. Employees Profit Sharing 401(k) Plan is a plan, fund or program established by Reppert, Inc. relating to benefits described in 29 U.S.C. § 1002(2).

3. The R.L. Reppert, Inc. 401(k) Plan is a "defined contribution" pension plan or "individual account plan" within the meaning of 29 U.S.C. § 1002(35).

4. R.L. Reppert, Inc. is the plan sponsor and the plan administrator for its 401(k) Plan.

5. Richard L. Reppert is the trustee and a fiduciary of the R.L. Reppert, Inc. 401(k) Plan.

---

[29]    See Joint Trial Exhibit 30.

6. Plaintiff Derrick Askew was enrolled in the 401(k) Plan and has been a plan participant, within the meaning of 29 U.S.C. § 1002(7) since 2007.

7. Defendant Reppert, Inc. is liable to plaintiff Derrick Askew in the amount of $15,959.00 for its failure to timely produce plan documents for the period December 6, 2008 to October 2, 2009 and for its failure to timely produce its custodial agreement with the Nationwide Trust Company, FSB for the period May 17, 2012 to January 1, 2015.

8. Defendant Reppert, Inc. failed to engage an independent qualified public accountant to conduct an audit of the 401(k) Plan for plan years 2008 through 2011 as required by 29 U.S.C. § 1023(a)(3)(A).

9. Third-party defendant CalPac did not breach its contract to provide plan administration and recordkeeping services with defendant and third-party plaintiff Reppert, Inc.

10. Third-party defendant CalPac did not knowingly or recklessly misrepresent the nature of its plan administration and recordkeeping services to defendant and third-party plaintiff Reppert, Inc.

## DISCUSSION

As noted above, following this court's decision on the parties' cross-motions for summary judgment, the issues raised at trial and that remain before the court for adjudication are, with respect to plaintiff's Class Action Complaint:

Count One: (1) whether defendant Reppert, Inc. is liable under 29 U.S.C. §§ 1024(b)(4) and 1132(c)(1) for any failure to produce other custodial agreements for the 401(k) Plan (apart from the Nationwide agreement) and (2) what penalties, if any, should be imposed for defendant Reppert, Inc.'s failure to timely produce plan documents for the periods

December 6, 2008 to October 2, 2009 and May 17, 2012 to
January 1, 2015.

Count Four:  whether defendant Reppert, Inc. was
required by 29 U.S.C. § 1023(a)(3)(A) and failed to engage an
independent qualified public accountant to conduct an audit of
the 401(k) Plan for plan years 2008 through 2011

The issues raised at trial which remain for adjudica-
tion also include, with respect to defendants and third-party
plaintiffs' Amended Third Party Complaint:

Count One:  whether third-party defendant CalPac
breached its contract with defendant and third-party plaintiff
Reppert, Inc. to provide plan administration and recordkeeping
services for the 401(k) Plan.

Count Two:  whether CalPac, either knowingly or
recklessly, misrepresented the nature of its plan administration
and recordkeeping services to third-party plaintiff Reppert,
Inc.

## Plaintiff's Count One:  Document Production Obligations

### Other Custodial Agreements

After lengthy discussion and analysis in my
February 4, 2016 Opinion, I determined that Reppert, Inc.'s
agreement with Nationwide Trust Company, FSB was a contract or
instrument "under which the plan is established or operated" and
was therefore required to be furnished to plaintiff pursuant to

-26-

29 U.S.C. § 1024(b)(4).  In making that determination, I reviewed the Nationwide agreement and found that, although it primarily governs the relationship between Reppert, Inc. and the Nationwide Trust Company, FSB, it also dictates important aspects of the 401(k) Plan's provision of benefits.[30] Specifically, "from the perspective of a participant, the Nationwide Trust Company agreement establishes to a substantial extent where and how his or her benefits were going to be invested and who would be managing and administering his benefits account."[31]

In the February 4, 2016 Opinion, I also noted that plaintiff claimed entitlement to custodial agreements which predate the Nationwide agreement.  However, none of these other custodial agreements were identified or presented.  In fact, the only evidence in the summary judgment record of their existence was that part of the deposition testimony of Richard L. Reppert where he listed the names of some possible former custodians.[32] There was no evidence in the summary judgment record of the nature or terms of those agreements.

---

[30]   See Opinion dated February 4, 2016 and filed February 5, 2016 at pages 24-32 (Document 132).

[31]   Id. at pages 31-32.

[32]   Id. at page 32.

As a result, I denied both parties summary judgment with respect to those un-enumerated and un-identified custodial agreements, because, without being able to review and conduct the same analysis on those other custodial agreements as I did on the Nationwide agreement, I could not determine whether they were the type of document required to be produced by Section 1024(b)(4) or whether plaintiff was entitled to request them.[33]

Little additional evidence emerged at trial.

Although it is now clear that the custodian of assets for the 401(k) Plan in 2007 and 2008 was a company called "Matrix", no contract or agreement between Matrix and Reppert, Inc. was located or produced.[34]  Nor was any other information about the nature or terms of any such Matrix contract or agreement presented at trial.

Instead, plaintiff located and presented four documents relating to a company named Gruntal & Co., L.L.C.[35]

---

[33]      See id. at pages 32-34.

[34]      See Notes of Testimony of the non-jury trial conducted on February 29, 2016 in Allentown, Pennsylvania, styled "Transcript of Non-Jury Trial – Day 1 of 3 Before the Honorable James Knoll Gardner[,] United States District Judge" ("N.T. 2/29/2016") at pages 97-101; N.T. 3/2/2016 at pages 39-41.

[35]      See above, Findings of Fact, at ¶¶ 62-68 and related footnotes.

Plaintiff also makes reference in his proposed findings of fact and conclusions of law to "a Sterling document that shows an agreement that

(Footnote 35 continued):

However, plaintiff has provided little context to explain what these documents are and what, if any, relationship that Gruntal has or had with either Matrix or Reppert, Inc.

Indeed, the only testimony given at trial regarding Gruntal was that of Richard L. Reppert.  Specifically, Mr. Reppert first identified Gruntal as "the company that brought us California Pensions and the trust company".[36]  When shown the Gruntal documents, Mr. Reppert identified the first of these documents as a new account form for a personal directed brokerage account within the 401(k) Plan, held with Gruntal.[37]  However, Mr. Reppert was unable to identify the time period that he held that account with Gruntal.[38]

To the extent that plaintiff believes he is entitled to either the four Gruntal documents presented or any other Gruntal document that may exist, he has failed to show that they were operative on or after November 5, 2008, the date of his first document request.

---

(Continuation of footnote 35):

is now lost (Ex. J56)", but that document was never admitted into evidence. Plaintiff's Proposed Findings of Facts and Conclusions of Law (Document 156) at ¶ 100; see also N.T. 2/29/2016 at page 99.

[36]     N.T. 2/29/2016 at page 101.  It is unclear what entity Mr. Reppert is referring to as "the trust company".  It is possible that he means the Circle Trust Company, a company with which Reppert, Inc. contracted with in 2000.  See above, Findings of Fact, at ¶ 65 and footnote 21.

[37]     N.T. 2/29/2016 at page 104, 107-108.

[38]     Id. at 107.

If they were not operative when plaintiff made his
document requests, then, regardless of the content or nature of
the documents, plaintiff was not entitled to them.  As
previously explained in my February 4, 2016 Opinion,
Section 1024(b)(4) only requires the production of the latest,
operative plan documents.[39]  If they were not operative, then

_____

[39]    See Opinion dated February 4, 2016 and filed February 5, 2016 at
page 52 n. 91; see also 29 U.S.C. § 1024(b)(4); Fischer v. Carpenters Pension
and Annuity Fund of Philadelphia and Vicinity, 2011 WL 3438091, at *6
(E.D.Pa. Aug. 5, 2011); Leung v. Skidmore, Owings & Merrill LLP,
213 F.Supp.2d 1097, 1104-1105 (N.D.Cal. 2002); Jackson v. E.J. Brach
Corporation, 937 F.Supp. 735, 739 (N.D.Ill. 1996).

        In Plaintiff's Proposed Findings of Facts and Conclusions of Law,
plaintiff read that part of my February 4, 2016 Opinion as "question[ing] the
ability to impose a penalty for failure to produce the current agreement in
2008, once a new agreement replaced it."  Plaintiff's Proposed Findings of
Facts and Conclusions of Law at ¶ 98.

        Plaintiff is mistaken.  I did not claim that the court could not
or would not impose an appropriate penalty under 29 U.S.C. § 1132(c)(1) for
any failure to produce documents if those documents became outdated.  Rather,
I found that, consistent with its plain language and purpose,
Section 1024(b)(4) does not permit the court to compel the production of the
outdated or inoperative documents.

        In other words, if, for example, a plan participant requested a
copy of the trust agreement in 2010 and that trust agreement was subsequently
superseded by an updated 2016 version, then Section 1024(b)(4) and 1132(c)(1)
permits a penalty for the delay in the receipt of the trust agreement,
running from 31 days after participant's request to when he receives the
current, operative trust agreement, but does not compel the production of the
defunct trust agreement.

        Adopting the new trust agreement does not extinguish any
penalties that might have accrued.  It merely affects which document is the
"latest", operative agreement that is required to be produced to plaintiff at
that point in time.

        The contrary interpretation of Sections 1024(b)(4) and 1132(c)(1)
-- namely, that they require the production of the plan document operative at
the time of the request, in perpetuity and regardless of whether it is later
superseded -- is not only inconsistent with the plain language and purpose of
those sections, as has already been explained, but could potentially result
in circumstances where plan administrators cannot find and produce long-
defunct plan documents and face an unlimited document production penalty.

they were not responsive to any of plaintiff's document
requests, and they were not improperly withheld by Reppert, Inc.

The weight of the evidence presented at trial suggests
that they were not.

Starting from the face of the documents themselves,
they are all dated between July 29, 2000 and February 15, 2001.
In other words, the latest of these documents is dated over six
years before plaintiff began employment with Reppert, Inc. and
over seven years before his first document request.

Certainly, as plaintiff's counsel suggested at trial,
this fact does not preclude the possibility that these documents
or any other agreement Reppert, Inc. may have had with Gruntal
was still operative seven years later, but plaintiff has not
offered any countervailing evidence to suggest that they were.

On the contrary, if as plaintiff contends, Gruntal
was, in fact, a former custodian of assets for the 401(k) Plan,
then any contract or agreement between Reppert, Inc. and Gruntal
would not have been operative during 2007 and 2008.  As Richard
L. Reppert and Dianna L. Reppert testified in this case, the
custodian of assets for the 401(k) Plan during that time period
was a company called Matrix, not Gruntal.[40]

---

[40]     Plaintiff's Proposed Findings of Facts and Conclusions of Law at
¶¶ 46, 48-50, 96, 100.

Furthermore, contemporaneous notes on the last of the four Gruntal documents, the Gruntal Plan Document, indicate that, at the very least, that specific document was defunct soon after 2000.  In particular, a handwritten note signed by Larry Delhagen, a Gruntal executive, on the first page of the document reads:  "[t]his is an interim account to ACAT in assets from Legg Mason and liquidate assets so cash can be . . . to Circle Trust to establish . . . 401(k) Plan.  NO contributions will be made to this."[41]

In other words, whatever account or plan was established by or associated with this document was temporary and never directly received any employee contributions.  It is highly unlikely that such an account or plan and any related governing documents were still operative seven years later in 2008.  Even if somehow they were, it would be highly unlikely that plaintiff Askew contributed to, and was a participant in, that plan or account.

Although Mr. Delhagen's contemporaneous notes only speak directly to the last of the four Gruntal documents, the four Gruntal documents were produced together, identified by the parties as a single exhibit and consequently, must be considered together.  In other words, the fact that the last of the four

---

[41]    Joint Trial Exhibit 55c at J2009 (emphasis in original).

Gruntal documents relates to an inoperative plan and was itself inoperative by 2008 suggests that the other Gruntal documents were similarly inoperative on that date.

The above evidence is hardly definitive, but in the absence of any countervailing evidence, no other conclusion can be drawn.  Plaintiff has not demonstrated that any Gruntal documents were operative when he made his document requests, and as a result, plaintiff cannot demonstrate any entitlement to them or any other document relating to a prior agreement between Gruntal and Reppert, Inc.

In light of the paucity of evidence presented at trial regarding any previous custodial agreements for the 401(k) Plan, I cannot find that Reppert, Inc. improperly withheld any other such documents from plaintiff.  Accordingly, I grant judgment in favor of defendant Reppert, Inc. against plaintiff Derrick Askew on that part of Count One of plaintiff's Class Action Complaint alleging that defendant Reppert, Inc. improperly withheld any other custodial agreements (apart from the Nationwide agreement) in violation of 29 U.S.C. §§ 1024(b)(4), 1132(c)(1).

### Document Penalties

Although Reppert, Inc. is not liable for any failure to produce any other documents relating to former custodians, I previously determined in my February 4, 2016 Opinion that it was liable for (1) its delay in producing any requested plan

-33-

documents from December 6, 2008 (31 days after plaintiff's first document request) to October 2, 2009 and for (2) its failure to produce the Nationwide agreement from May 17, 2012 (31 days after plaintiff's April 16, 2012 Document Inventory) to sometime in January 2015.[42]

However, I did not make a determination then as to what penalties should be imposed on defendant Reppert, Inc. for these delays in document production, because there were outstanding factual issues that could not be resolved at the summary judgment stage. After trial in this matter, in which the parties were able to develop the relevant factual issues, it is now appropriate to make that determination.

Title 29 United States Code Section 1132(c)(1) provides in pertinent part:

> [a]ny administrator . . . who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary . . . may in the court's discretion be personally liable to such participant or beneficiary in the

---

[42]   See Opinion dated February 4, 2016 and filed February 5, 2016 at pages 46-49.

As explained in that February 4, 2016 Opinion, plaintiff received the Nationwide agreement pursuant to his subpoena dated January 8, 2015. However, plaintiff did not make clear then, nor has he made clear now, exactly which day he received the document.

In Plaintiff's Proposed Findings of Facts and Conclusions of Law, plaintiff suggests that he received the Nationwide agreement on January 15, 2015, but there is nothing in the trial record to support that claim. See Plaintiff's Proposed Findings of Facts and Conclusions of Law at ¶ 148.

> amount of up to $100 a day from the date of
> such failure or refusal.

The Secretary of Labor, pursuant to the Federal Civil Penalties

Inflation Adjustment Act of 1990, has increased that maximum

penalty to $110 per day.  29 C.F.R. § 2575.502c-1.

To determine whether to impose a penalty and how great

a penalty, I may consider a number of factors including "bad

faith or intentional conduct on the part of the administrator,

the length of the delay, the number of requests made and

documents withheld, and the existence of any prejudice to the

participant or beneficiary."  Romero v. SmithKline Beecham,

309 F.3d 113, 120 (3d Cir. 2002).

> Since the penalty provisions of
> Section 1132(c) are aimed at inducing
> administrators to comply promptly with
> requests for information about the plan, the
> primary focus of a court in assessing
> damages under that section should be the
> conduct of the administrator upon whom the
> liability is personally imposed.  If a plan
> administrator in good faith is unable to
> comply with a request for information within
> the thirty (30) day period, the assessment
> of the statutory penalty would not further
> the statute's purpose.  However, if an
> administrator intentionally withholds
> information, for whatever reason, where a
> proper request has been made, the assessment
> of the statutory penalty would be
> appropriate even though the participant or
> beneficiary cannot show prejudice arising
> therefrom.

Porcellini v. Strassheim Printing Company, Incorporated,

578 F.Supp. 605, 614 (E.D.Pa. 1983) (Van Artsdalen, J.); see

also Rumpf v. Metropolitan Life Insurance Company,
2010 WL 2902543, at *10 (E.D.Pa. July 23, 2010) (Baylson, J.);
Maiuro v. Federal Express Corporation, 843 F.Supp. 935, 943
(D.N.J. 1994).

Because there are two distinct time periods of delay,
each involving a separate set of documents and circumstances, I
will analyze and then assess an appropriate document penalty for
each period individually.

### December 6, 2008 to October 2, 2009

On November 5, 2008, plaintiff Derrick Askew made his
first written request for documents.  He requested, among other
things, a copy of the latest plan document and amendments and
restatements thereof, a copy of the latest summary plan
description and any subsequent summary of material
modifications, and "[a] copy of any trust agreement, custodial
agreement or other document governing the trust and custody of
assets of the Plan or any successor thereto. . . .  Any other
instrument under which the Plan has been established or
operated."[43]  Plaintiff Askew did not receive any requested
documents until October 2, 2009.

Not inclusive of the first thirty days following his
document request and the final day on which plaintiff received

---

[43]   Joint Trial Exhibit 1.

the requested documents, the total delay measures 300 days.
This substantial delay subjects defendant Reppert, Inc. to a
maximum possible statutory penalty of $33,000.00.

In light of the circumstances, however, the court
finds that a document penalty of $50 per day, yielding a penalty
for this period of time of $15,000.00, as opposed to the
statutory maximum, is appropriate.

First and foremost, although defendant Reppert, Inc.
withheld documents intentionally and not inadvertently, it did
so with something less than bad faith.  There were two principal
reasons for the delay in document production between November 5,
2008 and October 2, 2009:  (1) defendant Reppert, Inc.'s
requiring plaintiff to first pay a $1,800.00 charge before
forwarding the documents to him and (2) an unfortunate but
faultless breakdown in communications.

On December 5, 2008, the final day to timely respond
to plaintiff's first document request, counsel for defendant
Reppert, Inc. sent counsel for plaintiff a letter explaining
that he was in possession of the requested documents but that
the cost of procuring and assembling those documents was
$1,800.00.  He further stated that he would only forward the
requested documents if that sum was paid.

In my February 4, 2016 Opinion, I explained that this $1,800.00 charge for the documents was impermissible.[44]  Although 29 U.S.C. § 1024(b)(4) permits the plan administrator to "make a reasonable charge to cover the cost of furnishing such complete copies", the Secretary of Labor has determined that a reasonable charge is one "equal to the actual cost per page to the plan for the least expensive means of acceptable reproduction" that "in no event may . . . exceed 25 cents per page."  29 C.F.R. § 2520.104b-30.  The applicable regulation also explicitly excludes any charges for handling or postage.  See id.

However, there is no dispute here that the majority of the $1,800.00 charge was to account for the labor costs in assembling the documents, and in any case, the total $1,800.00 charge far exceeds the maximum permitted charge of 25 cents per page.  Consequently, the $1,800.00 charge was unreasonable and cannot justify or excuse Reppert, Inc.'s withholding of plan documents.

To the extent that the delay was a result of Reppert, Inc.'s request for an impermissible and excessive charge, Reppert, Inc. was wholly at fault for the delay.[45]  However, the

---

[44]    Opinion dated February 4, 2016 and filed February 5, 2016 at pages 47-48.

[45]    It is possible that defendant Reppert, Inc. only requested such a

(Footnote 45 continued):

-38-

delay was also a product of an unfortunate breakdown in communications between the parties.

Later the same day, December 5, 2008, plaintiff's counsel responded by e-mail to defendant's counsel requesting an itemization of the documents that produced a total charge of $1,800.00.  With respect to what occurred next, I credit both the testimony of plaintiff's counsel, Kent G. Cprek, and defendants' counsel, Walter H. Flamm.  Namely, upon receipt of Mr. Cprek's December 5, 2008 e-mail, Mr. Flamm called Mr. Cprek's office, seeking to explain the charge and otherwise amicably resolve the document request.  Because Mr. Cprek was not then available to receive that call, Mr. Flamm left a message.  However, for unknown reasons that cannot be attributed to any party of this litigation, Mr. Cprek never received that message.

Because Mr. Flamm and Mr. Cprek were only aware of his own last communication with the other, each reasonably expected the other to respond, and in the intervening months prior to plaintiff's filing of his first complaint, there were no further

(Continuation of footnote 45):

high charge, because it suspected (correctly) that the November 5, 2008 document request from plaintiff was really at the behest of the local carpenters union.  However, even if that were true, it would not excuse defendant's actions.  There is no question that plaintiff Askew is a participant in the 401(k) Plan who is entitled to request plan documents pursuant to 29 U.S.C. § 1024(b)(4).  Section 1024(b)(4) makes no exceptions, and plan administrators are not absolved of their statutory obligations, for reasonable suspicions of ulterior motives.

communications between plaintiff and defendants.  If there were any fault to be found for the lack of follow-up during this period of time, both plaintiff and defendants would share that fault.

Shortly following the filing of plaintiff's first complaint on April 2, 2009, counsel for plaintiff and defendants resumed their dialogue, working together to determine which documents were requested and needed to be produced.  I further credit the testimony of Mr. Flamm that, based on the tenor of that dialogue, plaintiff was not insisting on immediate production of those documents.  Eventually, on October 2, 2009, defendant Reppert, Inc. produced the requested plan documents without charge.

Because defendant Reppert, Inc. was not responsible for this second principal reason for the delay in document production -- the breakdown and resumption of dialogue regarding the document production -- the maximum statutory penalty would not be appropriate.

Rather, a $50 per day penalty, in the middle of the range of possible penalties, best strikes the balance between punishing defendant Reppert, Inc. for its improper conditioning of its document production on an excessive charge and not punishing defendant for a breakdown in communication, for which it was not at fault.

This moderate penalty also gives credit to defendant Reppert, Inc. for those communications, in which it is evident that defendant was working with plaintiff in good faith to determine which documents it needed to produce.  In this sense, this case is unlike those cited by plaintiff, where the plan administrator was completely unresponsive to plaintiff's document requests.  See e.g. Daniels v. Thomas & Betts Corporation, 263 F.3d 66, 79-80 (3d Cir. 2001).

I have also considered the other factors prescribed by Romero and find that they also support a moderate penalty of $50.00 per day:  although 300 days is a substantial delay, it is not so egregious as the delays in many other cases.  See e.g. Colarusso v. Transcapital Fiscal Systems, Incorporated, 227 F.Supp.2d 243, 263 (D.N.J. 2002), involving a penalty period of 928 days; Boyadjian v. CIGNA Companies, 973 F.Supp. 500, 506 (D.N.J. 1997), involving a penalty period of 773 days; Lloynd v. Hanover Foods Corporation, 72 F.Supp.2d 469, 480 (D.Del. 1999), involving a penalty period of 505 days.

Moreover, although defendants withheld a large number of documents, plaintiff was not substantially prejudiced, if at all, by the withholding of those documents or by the delay.

Plaintiff contends that the "frustration, trouble, and expense" of initiating these lawsuits has prejudiced him.  Davis v. Featherstone, 97 F.3d 734, 738 (4th Cir. 1996); see also

Boyadjian, 973 F.Supp. at 506. However, the court finds that
the unique circumstances of this case distinguish it from cases
like Davis or Boyadjian. The primary impetus for plaintiff's
November 5, 2008 document request was not to enable plaintiff to
raise an issue or make a claim regarding his benefits under the
plan.[46]

On the contrary, as plaintiff's counsel Mr. Cprek
testified, whenever his firm

> received reports of contractors on
> prevailing wage jobs whose numbers appear to
> be too good to be possible . . . we send the
> same [document request] letter. . . . [T]he
> [carpenters] union has an interest . . . in
> assuring that everybody who is supposed to
> be paying the prevailing wage pays it, and
> so that's why we do these requests, and
> that's why we do these cases.[47]

In other words, the primary impetus for the
November 5, 2008 document request was for the local carpenters
union to investigate and monitor non-union contractors.
Moreover, to facilitate its investigations, the local carpenters
union introduced the plaintiff Derrick Askew to Mr. Cprek and
has paid all of the legal fees in this case.

There is no evidence in this case that plaintiff has
suffered any harm apart from the "frustration, trouble, and

---

[46]     In fact, apart from this present lawsuit, plaintiff Askew has not
made any inquiries about or withdrawn any money from his account in the
401(k) Plan. See N.T. 3/2/2016 at pages 22-23.

[47]     N.T. 3/2/2016 at pages 92-93.

expense" of having to bring these actions against defendants, but it is not even clear that plaintiff has experienced much frustration or trouble.  Certainly, he has not had to undertake any expenses.  The minimal prejudice, if any, plaintiff has suffered further militates against the imposition of the maximum penalty.

### *May 17, 2012 to January 2015*

Shortly after receiving plan documents from defendant Reppert, Inc. on October 2, 2009, plaintiff voluntarily dismissed his first complaint "without prejudice" on December 21, 2009.  However, over a year later, on June 17, 2011, plaintiff filed the present lawsuit, alleging that that document production was deficient.

At the prompting of United States Magistrate Judge Henry S. Perkin, plaintiff produced and sent to defendants a Document Inventory on April 16, 2012, listing the documents he believed he was entitled to but had not received from defendant Reppert, Inc.  Among the many documents listed in that Document Inventory, plaintiff included the Nationwide agreement.[48]

As mentioned above, in my February 4, 2016 Opinion regarding plaintiff's and defendants' cross-motions for summary judgment, I determined that the Nationwide agreement was a

---

[48]     See above, Findings of Fact, at ¶ 46.

contract or instrument "under which the plan is established or operated" and was therefore required to be furnished to plaintiff pursuant to 29 U.S.C. § 1024(b)(4).[49]  Consequently, I also determined that defendant Reppert, Inc. is liable for its failure to produce the Nationwide agreement from 31 days after April 16, 2012, the date plaintiff requested it in his Document Inventory, to sometime in January 2015, when plaintiff received it pursuant to a third-party subpoena.

I remarked in my February 4, 2016 Opinion that the summary judgment record did not make it clear what day that plaintiff actually received the Nationwide agreement.[50] Unfortunately, plaintiff also failed to clarify this issue at trial.  There is nothing in the trial record to suggest when exactly in January 2015 that he received the Nationwide agreement.

Because it would be unfair for the court to impose any document penalty based on an unsupported guess as to when plaintiff actually received the document, I find, for the purpose of determining the penalty, that the terminal date of this penalty period is January 1, 2015.  Thus, the total delay,

---

[49]    See above, at pages 26-33; Opinion dated February 4, 2016 and filed February 5, 2016 at pages 24-32.

[50]    See Opinion dated February 4, 2016 and filed February 5, 2016 at page 49 and footnote 88.

from May 17, 2012 to January 1, 2015, measures 959 days.  The maximum statutory penalty for that length is $108,790.00.

However, I find that a nominal penalty of $1 per day for those 959 days, yielding a penalty of $959.00 is most appropriate.

Defendants did not produce the Nationwide agreement, because they believed that they were not required to produce it pursuant to 29 U.S.C. § 1024(b)(4).

That belief was neither frivolous nor unreasonable. Section 1024(b)(4) does not explicitly require its production, and as I noted in my February 4, 2016 Opinion, I am not aware of any legal precedent that has specifically addressed this issue.[51] Indeed, I concluded that Section 1024(b)(4) does require the production of the Nationwide agreement only after an extensive analysis, and even then, I found it a close question.[52]

Consequently, imposing a substantial document penalty in these circumstances would not serve its purpose in "provid[ing] plan administrators with an incentive to comply with the requirements of ERISA and to punish noncompliance." In re Interstate Bakeries Corporation, 704 F.3d 528, 534 (8th Cir. 2013) (quoting Starr v. Metro Systems, Inc., 461 F.3d 1036, 1040 (8th Cir. 2006)); see also Mondry v. American Family

---

[51]     See id. at page 27, footnote 45.

[52]     See id. at pages 24-32.

<u>Mutual Insurance Company</u>, 557 F.3d 781, 806 (7th Cir. 2009). Punishing Reppert, Inc. for failing to comply with a requirement it was reasonably not aware of would not provide it or any other plan administrator any future incentive to comply with requirements it is not reasonably aware of, and it would be unfair.

Moreover, although the length of the delay was substantial, for the same reasons outlined earlier, plaintiff has not been prejudiced by defendant Reppert, Inc.'s failure to timely produce the Nationwide agreement, which further supports the nominal penalty imposed in this case.

For the foregoing reasons, I grant judgment in favor of plaintiff Derrick Askew in the amount of $15,959.00 against defendant Reppert, Inc. on that part of Count One of plaintiff's Class Action Complaint requesting penalties under 29 U.S.C. §§ 1024(b)(4), 1132(c)(1) for defendant Reppert, Inc.'s failure to timely produce plan documents for the periods December 6, 2008 to October 2, 2009 and May 17, 2012 to January 1, 2015.

### Plaintiff's Count Four:  Audit Requirement

As the result of this court's February 4, 2016 Opinion on plaintiff's and defendants' cross-motions for summary judgment, the issue raised in Count Four of plaintiffs' Class Action Complaint regarding audits for the 401(k) Plan for plan years 2008 through 2011 has been narrowed to a single factual

issue -- whether there were more than 120 participants in the 401(k) Plan at the beginning of the 2008 plan year.

As explained at length in that opinion, 29 U.S.C. § 1023(a)(3)(A) generally requires a plan administrator to "engage an independent qualified public accountant" to audit the plan each year and attach that audit to the plan's annual report (Form 5500).  However, Section 1023(a)(3)(A) also provides that the Secretary of Labor can waive the audit requirement for those plans required only to file a simplified annual report (Form 5500-SF).[53]

A plan may generally only file a simplified annual report if it has fewer than 100 participants at the beginning of the plan year.  See 29 U.S.C. § 1024(a)(2).  However, pursuant to the "80-120 participant rule", a plan with between 80 and 120 participants at the beginning of a plan year can continue to file a simplified annual report if it did so the previous year. See 29 C.F.R. § 2520.103-1(d).

There is no dispute that prior to 2008 the 401(k) Plan had fewer than 100 participants, and defendant Reppert, Inc. was permitted to file simplified annual reports for those plan

---

[53]     In order to qualify for the audit exemption, a plan must also satisfy three additional requirements set forth in 29 C.F.R. § 2520.104-46(b).  In my February 4, 2016 Opinion, I determined that there was no genuine, factual dispute that the 401(k) fulfilled those three additional requirements, qualifying it for the audit exemption.  See Opinion dated February 4, 2016 and filed February 5, 2016 at pages 59-60; see also Opinion dated and filed February 26, 2016 at pages 10-12 (Document 141).

years.  Nor is there any dispute that the 401(k) Plan became
ineligible for simplified annual reporting for the 2012 plan
year onwards, and that defendant Reppert, Inc. filed the
standard annual report and complied with the audit requirement
for those plan years.

The dispute in this case concerns the plan years 2008
through 2011.  Defendant Reppert, Inc. filed simplified annual
reports and did not engage and attach an audit of the plan for
those plan years, because as it claimed on those annual reports,
the 401(k) Plan had between 110 and 118 participants at the
beginning of each of those plan years and thus fell within the
ambit of the 80-120 participant rule.

However, plaintiff contends that defendant was
mistaken, at minimum, with respect to the number of participants
in the 401(k) Plan at the beginning of the 2008 plan year.
Specifically, plaintiff claims that, contrary to what was
certified on the annual report, there were more than 120
participants in the 401(k) Plan at the start of the 2008 plan
year.  If plaintiff is correct, this one fact triggers a cascade
of necessary consequences:  (1) the 401(k) Plan fell outside the
ambit of the 80-120 participant rule; (2) the 401(k) Plan was
not entitled to file a simplified annual report for plan year
2008 by dint of the fact that it had the previous year; (3) the
401(k) Plan was also not entitled to file simplified annual

reports for plan years 2009, 2010 or 2011 for the same reason;
(4) the 401(k) Plan was ineligible for the audit exemption for
the plan years from 2008 to 2011; and therefore, (5) defendant
Reppert, Inc.'s failure to engage an audit of the 401(k) Plan
for those plan years violated ERISA.[54]

Following trial in this matter, the ineluctable
conclusion is that there were more than 120 participants in the
401(k) Plan at the beginning of 2008.

Unsurprisingly, none of the witnesses could recall or
testify to the number of participants in the 401(k) Plan at the

---

[54]     ERISA in Title 29 United States Code Section 1132(a)(3) allows "a
participant, beneficiary, or fiduciary" to bring suit

> (A) To enjoin any act or practice which violates any
> provision of this subchapter or the terms of the
> plan, or (B) to obtain other appropriate equitable
> relief (i) to redress such violations or (ii) to
> enforce any provisions of this subchapter or the
> terms of the plan.

"[M]aking out such a claim does not require bad faith; it merely requires a
violation of ERISA." Leckey v. Stefano, 501 F.3d 212, 229 (3d Cir. 2007).

Defendants argue that, to make out his claim, plaintiff is
required to show, among other things, detrimental reliance on a material
misrepresentation.  Defendants are mistaken.  The cases that defendants cite
to support their proposition specifically involve breach of fiduciary duty
claims based on misrepresentations made by a fiduciary.  See e.g., Shook v.
Avaya Incorporated, 625 F.3d 69, 73 (3d Cir. 2010).  In those cases, the
plaintiff sought to enforce or remediate a breach of 29 U.S.C. § 1104(a)(1),
which imposes a duty of loyalty and prudence upon plan fiduciaries.  See id.
(citing In re Unisys Corporation Retiree Medical Benefits ERISA Litigation,
579 F.3d 220, 228 (3d Cir. 2009)).

However, 29 U.S.C. § 1132(a)(3) is not limited to enforcing
29 U.S.C. § 1104.  Indeed, plaintiff here seeks to enforce 29 U.S.C.
§ 1023(a)(3)(A), a completely different section of ERISA which imposes a
technical, audit requirement upon the plan administrator.  It makes no sense
to impose upon the plaintiff the requirements of demonstrating a violation of
§ 1104 as a prerequisite to demonstrating a violation of § 1023(a)(3)(A).

end of 2007 or at the beginning of 2008.  Thus, the only evidence in the record that speaks directly to this factual issue were the 2007 and 2008 annual reports themselves,[55] the annual statements of benefits for the period ending on December 31, 2007 and CalPac's computerized records.

Of this evidence, the sole piece that supports defendants' contention that the 2008 annual report reflects the correct number of participants (113) is the report itself, contemporaneously certified as "true, correct and complete" by Richard L. Reppert.[56]

However, testimony given at trial substantially undermines the reliability of that certification.  Specifically, Mr. Reppert testified that he did not actually understand how plan participants are determined or calculated but instead relied entirely upon CalPac's recommendation.[57]  Although that recommendation was the product of good-faith collaboration between Reppert, Inc. and CalPac, it was nothing more than a recommendation -- not a definitive determination.  As Cynthia Ellner, co-owner of CalPac, testified,

---

[55]     As explained above, the 2007 and 2008 Summary Annual Reports for the 401(k) Plan are generated from the 2007 and 2008 annual reports and therefore do not reflect anything different from the 2007 and 2008 annual reports.  See above, Findings of Fact at ¶ 76.

[56]     Joint Trial Exhibit 34 at page 1.

[57]     See N.T. 2/29/2016 at pages 38, 115-116.

A.   No, we don't make a determination.   We
work with the client and make a
recommendation.

Q.   Okay.  Do you -- do you make a
recommendation whether the plan should be
audited?

A.   We will recommend that the client meet
with an auditor and count bodies, basically.

Q.   Did you recommend that the client meet
with an auditor and count bodies in 2007?

A.   I am not aware of whether we did or did
not.[58]

Moreover, as the Client Service Agreement between
Reppert, Inc. and CalPac makes clear, CalPac "is not a provider
of legal advice", and Reppert, Inc. "agrees to seek the advice
of an attorney . . . for advice and counseling on legal issues
[and] . . . . agrees to verify any legal or investment advice
which it may incidentally receive from CALPAC in the course of
servicing the Plan."[59]

No evidence in the record suggests that Reppert, Inc.
ever engaged an auditor to "count bodies" for the 401(k) Plan.
Nor is there any indication that Reppert, Inc. took any other
steps to independently verify the information, including the
number of participants, in the annual reports for the 401(k)
Plan.

---

[58]   N.T. 3/1/2016 at page 50.

[59]   Joint Trial Exhibit 19 at page 2.

On the other hand, the rest of the documentary evidence suggests that the number on the 2008 annual report was, in fact, erroneous.

First, when the 2007 and 2008 annual reports are juxtaposed, a discrepancy appears -- namely, the 2007 annual report lists 129 participants with account balances as of the end of the 2007 plan year.  However, as noted above, the 2008 annual report lists 113 participants at the beginning of the 2007 plan year.  In other words, these two annual reports, if they were both correct, indicate that on December 31, 2007, there were at least 129 participants in the 401(k) Plan, but on January 1, 2008, there were only 113 participants.

A similar discrepancy exists between the 2008 annual report and the number of annual statements of benefits for the 2007 plan year.  As noted above, each year, CalPac would prepare an annual statement of benefits for each current or former participant in the 401(k) Plan.[60]  The annual statement of benefit reflects, among other things, the total ending balance in that participant's account in the 401(k) Plan as of the end of the plan year.

For the 2007 plan year, CalPac generated 142 annual statements of benefits.  By the court's count, six of those

---

[60]     See above, Findings of Fact, at ¶¶ 85-86.

annual statements reflect no ending balances for those
individuals.  Two others include no vested balances for those
participants, although they acknowledge non-vested balances.
Finally, five others indicate minimal ending balances.  Even if
the court excluded all 13 of these statements,[61] that would still
leave 129 statements with substantial positive account balances
as of December 31, 2007.[62]

Finally, CalPac's computerized records, retrieved on
February 22, 2016, also reflect a number of participant accounts
on December 31, 2007 that exceeds substantially the 113 figure
on the 2008 annual report.  Specifically, those computerized
records reflect a total of 145 accounts, with 13 of those
accounts coded as "TERMINATED/PAID OUT".  A logical
interpretation of these numbers would be that there were 132
participant accounts which had not yet been paid out as of
December 31, 2007.

However, I do not give great weight to these
computerized records, because I credit the testimony of
Ms. Ellner, who claimed that once an individual is coded a
certain way, that individual's coded status cannot be changed
for that year.  As she suggested, "[f]or all I know, a hundred

---

[61]    I do not mean to suggest that it would be legally appropriate to
exclude these twelve individuals in determining the number of participants in
the 401(k) Plan.

[62]    See N.T. 3/1/2016 at pages 87, 98-100.

of them could be terminated with term[ination] dates that came in on the [employee] census after the end of the year."[63]

Nonetheless, the computerized records must be evaluated in the context of the other documentary evidence, and the remarkable consistency of that evidence regarding the number of participants with positive account balances in the 401(k) Plan on the last day of 2007 compels the conclusion that there were at least 129 participants with positive account balances in the plan on December 31, 2007.

Defendants have provided no satisfactory explanation for this critical discrepancy between the number of participants in the 401(k) Plan on December 31, 2007 (over 129, as discussed above) and the number of participants in the 401(k) Plan on January 1, 2008 (113, according to the 2008 annual report). Indeed, I note that no such discrepancy appears again for any year after 2008.[64]

---

[63]   N.T. 3/1/2016 at page 109.

[64]   Here, I compared the subsequent annual reports for plan years 2008 through 2013.  The parties submitted these annual reports (as Joint Trial Exhibits 35 through 39), but they were not admitted into evidence.  As matters of public record, I take judicial notice of them, not for the truth of the matter but that they are mutually consistent.  See Schmidt v. Skolas, 770 F.3d 241, 249 (3d Cir. 2014); Fed.R.Evid. 201.

Thus, for example, I take judicial notice of the fact that the 2009 annual report lists 118 participants with positive account balances at the end of the 2009 plan year and that the 2010 annual report lists 118 participants at the beginning of the 2010 plan year.  I am not taking judicial notice that the 2009 and 2010 annual reports are accurate as to the number of participants at those respective times.

In her testimony, Ms. Ellner speculated that it was possible that some participants may have already terminated their employment and withdrew their money from the 401(k) Plan prior to December 31, 2007, but that their benefits distribution checks had not cleared as of December 31, 2007.[65]   However, assuming that checks can clear on January 1st, a national holiday, over sixteen benefits distribution checks would have had to have all cleared on January 1, 2008.[66]  It is unlikely that over sixteen employees and participants of the 401(k) Plan, who terminated their employment and requested a distribution of their benefits all independently of each other, would have their benefits distribution checks all clear on the same day.

Moreover, when one compares the 2007 annual statements with the 2008 annual statements for the 401(k) Plan, of the 134 participants with positive account balances at the end of 2007,[67] 127 of those same participants continued to have positive account balances at the end of 2008.  In other words, at least fourteen individuals would have had to terminate their

_____

[65]    See N.T. 3/1/2016 at pages 91, 107.

[66]    129 - 113 = 16.  If these hypothetical distribution checks had cleared before December 31, 2007, then the annual statement of benefits for those participants would have reflected no balance.  If the checks did not clear until after January 1, 2008, then the participants' benefits were still in the 401(k) Plan.

[67]    Here, I include those five individuals with minimal account balances.

employment and withdraw their benefits on or before December 31, 2007, had their distribution checks clear on January 1, 2008, and then have been re-hired and re-accumulated benefits in the 401(k) Plan in 2008.[68]  Although this is theoretically possible, I find these circumstances very unlikely.

Ms. Ellner also explained that some of the annual statements of benefits, which reflect minimal account balances, may have belonged to individuals who had terminated their employment and withdrew their benefits but subsequently received residual dividends.  As she testified, regarding the annual statements of benefits:

> Q.   Okay.  And -- I also noted that there were a few individuals with small account balances, you know, less than $10.  Can you explain that?
>
> . . .
>
> A.   Residual dividends come in after the person has been paid out.
>
> As I mentioned earlier, some people are -- are quite adamant that their checks get issued right away.  And if a mutual fund, without us knowing it, has already [issued a] dividend, that money is going to come and get posted into their account after they've received a check.
>
> And we have to go through periodically manually and sweep those numbers out into checks to these people, which is quite an

---

[68]    127 - 113 = 14.

> onerous task, because there's a check
> charge. . . .
>
> And then you have to hope you can still find
> that person's address and get it mailed --
> get it mailed and get it to arrive to them.[69]

However, even if residual dividends entered the

accounts of a large number of terminated and paid-out employees

of the 401(k) Plan prior to December 31, 2007,[70] defendants do

not explain how they would have paid out those residual

dividends by January 1, 2008.

As just explained, defendants were unable to

satisfactorily explain the discrepancy.  However, based on the

testimony of Ms. Ellner, the court believes that the discrepancy

was most likely the result of defendants' and CalPac's

misunderstanding of who constitutes a "participant" for purposes

of ERISA.

Specifically, defendants and CalPac appear to have

believed that once they sent a benefits distribution check out

to a terminated employee who requested to withdraw his or her

benefits, that former employee no longer constituted a

participant.  Thus, even if residual dividends were later

credited to that former employee, defendants and CalPac would

---

[69]     N.T. 3/1/2016 at pages 89-90.

[70]     As mentioned, based on the court's own review of the 2007 annual
statements of benefits, only 5 individuals out of 142 appear to have had
minimal account balances that might be the result of residual dividends being
paid into their accounts.

still not consider that employee a participant in the 401(k)
Plan.

However, this belief fails to comport with ERISA's
broad definition of participant.  As 29 U.S.C. § 1002(7) states,
"[t]he term 'participant' means any employee or former employee
of an employer . . . who is or may become eligible to receive a
benefit of any type from an employee benefit plan which covers
employees of such employer . . . or whose beneficiaries may be
eligible to receive any such benefit."

This definition of "participant" is so expansive that
"the Supreme Court has held that the term covers a former
employee with a colorable claim for 'vested benefits.'"  Graden
v. Conexant Systems Incorporated, 496 F.3d 291, 296 (3d Cir.
2007) (citing Firestone Tire & Rubber Company v. Bruch,
489 U.S. 101, 118, 109 S.Ct. 948, 958, 103 L.Ed.2d 80, 97
(1989)).  Thus, in Graden, the United States Court of Appeals
for the Third Circuit held that a former employee who had
voluntarily "cashed out", i.e. received a complete distribution
of his benefits in the employer's 401(k) plan, still constituted
a "participant" in that plan where he had a colorable claim to
more benefits.[71]  496 F.3d at 297-298.

_____

[71]    Specifically, the plaintiff in Graden had a colorable claim that
the benefits he received when he cashed out of his plan would have been

(Footnote 71 continued):

Certainly, this broad definition of "participant" includes terminated employees with positive account balances -- balances, which represent undistributed benefits due to, but not yet received by, those terminated employees.

In light of the above, I find that there were more than 120 participants in the 401(k) Plan at the beginning of 2008.  Consequently, the 401(k) Plan was not permitted to file a simplified annual report and was not exempt from the audit requirement under 29 U.S.C. § 1023(a)(3)(A) for plan years 2008 through 2011.

I grant judgment in favor of plaintiff Derrick Askew against defendant R.L. Reppert, Inc. on that part of Count Four of plaintiff's Class Action Complaint alleging that defendant Reppert, Inc. failed to comply with the audit requirement set forth in 29 U.S.C. § 1023(a)(3)(A) with respect to the 401(k) Plan for the plan years 2008 through 2011.

---

(Continuation of footnote 71):

greater but for his former employer's fiduciary improprieties.  As the Third Circuit stated, "ERISA entitles individual-account-plan participants not only to what *is* in their accounts, but also to what *should* be there given the terms of the plan and ERISA's fiduciary obligations." Graden, 496 F.3d at 297 (emphasis in original).

**Defendants' and Third-Party Plaintiffs' Count One:  Breach of Contract**

Count One of defendants' and third-party plaintiffs'[72] Amended Third Party Complaint alleges a cause of action for breach of contract against third-party defendant California Pension Administrators & Consultants, Inc.  Specifically, defendants allege that CalPac breached its contract to provide defendant R.L. Reppert, Inc. with plan administration and recordkeeping services by incorrectly determining the number of participants in the 401(k) Plan at the beginning of 2008 and incorrectly recommending that defendant Reppert, Inc. not conduct an audit of the 401(k) Plan.

"The elements for a breach of contract action under California law are:  (1) the existence of a contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) damages to plaintiff as a result of the breach."  Buschman v. Anesthesia Business Consultants LLC, 42 F.Supp.3d 1244, 1250 (N.D.Cal. 2014); see also Lyons v. Coxcom, Incorporated, 718 F.Supp.2d 1232, 1237 (S.D.Cal. 2009).

Here, defendants' breach of contract claim fails, because they cannot establish by a preponderance of the evidence any breach by third-party defendant CalPac.

---

[72]    I will hereafter refer to defendants and third-party plaintiffs simply as "defendants".

Defendants' claim is premised on the idea that CalPac was solely responsible, factually and contractually, for determining who was a participant in the 401(k) Plan.  Thus, as they reason, any error regarding the number of participants in the 401(k) Plan or whether an audit was required must therefore be attributed to CalPac and constitute a breach of the Client Service Agreement.

However, that premise is unsupported by the facts or by the terms of the contract.

First, I credit the testimonies of Cynthia Ellner and Dianna L. Reppert that the annual reports for the 401(k) Plan, including the participant counts therein, were a product of a close collaboration between representatives of both Reppert, Inc. and CalPac.[73]  However, no testimony specified the exact nature or details of that collaboration.

Thus, as a purely factual issue, it is simply not clear that CalPac, as opposed to R.L. Reppert, Inc., was responsible for any error. Paragraph 11 of the Client Service Agreement specifically absolves CalPac of "any liability or obligation to the Client for any errors or omissions in

_____

[73]   See N.T. 3/1/2016 at pages 81, 94; N.T. 3/2/2016 at pages 35-36, 46.

-61-

servicing the Plan . . . except those arising <u>solely from the</u>
<u>actions of CALPAC</u>."[74]

Moreover, I also credit the testimony of Cynthia
Ellner that contractually, CalPac did not make a final
determination of how many participants are in the plan or
whether a plan should be audited, but rather worked with the
client to make a recommendation.[75]  This account of the nature of
CalPac's services is consistent with the fact that CalPac does
not itself file the annual report on behalf of the client, but
rather requires that the client review, certify and file the
annual report itself.

In practice, Richard L. Reppert and Dianna L. Reppert
may have relied entirely upon CalPac's recommendations and
treated them as final determinations, but in doing so, they
abdicated their own duties under the Client Service Agreement.
Specifically, Paragraph 2 of that agreement provides, in
relevant part, that

> The Client agrees that CALPAC is not a
> provider of legal advice, tax advice, or
> investment advice.  The Client agrees to
> seek the advice of an attorney, accountant
> or other financial advisor for advice and

---

[74]     Joint Trial Exhibit 19 at page 5 (emphasis added).

[75]     <u>See</u> N.T. 3/1/2016 at page 50.  In some cases, that recommendation
could be that the client should engage an auditor and "count bodies".  <u>Id.</u>
Ms. Ellner could not remember whether she recommended that defendant Reppert,
Inc. "count bodies" in 2007 or not.

> counseling on legal issues or the
> suitability of an investment.  The Client
> agrees to verify any legal or investment
> advice which it may incidentally receive
> from CALPAC in the course of servicing the
> Plan.  Such verification is the
> responsibility of the Client, and may
> include seeking the advice of an attorney,
> accountant or financial advisor.[76]

Thus, to the extent that CalPac incidentally provided legal advice to Reppert, Inc. in its preparation of the 401(k) Plan's annual reports -- unavoidably with respect to its determining the number of participants in the 401(k) Plan or whether an audit should be conducted, both complicated questions of law in this case -- defendant Reppert, Inc. was required to consult its attorney and independently verify that legal advice.

For the foregoing reasons, I conclude that defendants have not proven that third-party defendant CalPac breached its Client Service Agreement with defendant Reppert, Inc. Accordingly, I grant judgment for third-party defendant CalPac against defendants and third-party plaintiffs on Count One of their Amended Third Party Complaint.

### Defendants' and Third-Party Plaintiffs' Count Two:  Fraud

Count Two of defendants' and third-party plaintiffs' Amended Third Party Complaint alleges a cause of action for fraud against third-party defendant CalPac.  Specifically,

---

[76]    Joint Trial Exhibit 19 at page 2.

defendants allege that CalPac knowingly or recklessly misrepresented the plan administration and recordkeeping services they would provide to defendant Reppert, Inc.[77]

The elements of a fraud claim under either Pennsylvania or California law include "(1) misrepresentation . . . (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage."[78]  <u>Small v. Fritz Companies, Incorporated</u>, 65 P.3d 1255, 1258 (Cal. 2003); <u>see</u> <u>Gibbs v. Ernst</u>, 647 A.2d 882, 889 (Pa. 1994).

There is nothing in the record to suggest that third-party defendant CalPac made any misrepresentation to defendants as to the nature of its plan administration or recordkeeping services or what that misrepresentation was.  In fact, defendants do not even appear to argue their fraud claim in the proposed findings of fact and conclusions of law and post-trial memorandum which they submitted.

---

[77]     Count Two of defendants Amended Third Party Complaint is titled "Fraud/Negligent Misrepresentation" but only alleges that third-party defendant acted knowingly or recklessly, not negligently.  If defendants did, in fact, raise a negligent misrepresentation claim as well, that claim would fail for the same reasons.  See below at footnote 78.

[78]     A negligent misrepresentation claim under either Pennsylvania or California law also includes the necessary element of a misrepresentation. <u>See</u> <u>National Union Fire Insurance Company of Pittsburgh, PA v. Cambridge Integrated Services Group, Incorporated</u>, 89 Cal.Rptr.3d 473, 483 (Cal.Ct.App. 2009); <u>Gongloff Contracting, L.L.C. v. L. Robert Kimball & Associates, Architects and Engineers, Incorporated</u>, 119 A.3d 1070, 1076 (Pa.Super. 2015).

Accordingly, I grant judgment for third-party defendant CalPac against defendants and third-party plaintiffs on Count Two of their Amended Third Party Complaint.

## CONCLUSION

For the reasons expressed above, I find in favor of defendants, R.L. Reppert, Inc.; Richard L. Reppert; the R.L. Reppert, Inc. Employees Profit Sharing 401(k) Plan; and the R.L. Reppert, Inc. Money Purchase Plan (Davis Bacon Plan), against plaintiff Derrick Askew on that part of Count One of plaintiff's Class Action Complaint alleging that defendant R.L. Reppert, Inc. improperly withheld any other custodial agreements (apart from its agreement with the Nationwide Trust Company, FSB) in violation of 29 U.S.C. §§ 1024(b)(4), 1132(c)(1).

I find in favor of plaintiff Derrick Askew against defendant R.L. Reppert, Inc. in the amount of $15,959.00 on that part of Count One of plaintiff's Class Action Complaint requesting penalties under 29 U.S.C. §§ 1024(b)(4), 1132(c)(1) for defendant R.L. Reppert, Inc.'s failure to timely produce plan documents for the periods December 6, 2008 to October 2, 2009 and May 17, 2012 to January 1, 2015.[79]

---

[79]    All other parts of Count One of plaintiff's Class Action Complaint were dismissed by my Order and Opinion dated February 4, 2016 and filed February 5, 2016 granting in part and denying in part both plaintiff's and defendants' cross-motions for summary judgment.

I find in favor of plaintiff Derrick Askew against defendant R.L. Reppert, Inc. on that part of Count Four of plaintiff's Class Action Complaint alleging that defendant R.L. Reppert, Inc. failed to comply with the audit requirement set forth in 29 U.S.C. § 1023(a)(3)(A) with respect to the 401(k) Plan for the plan years 2008 through 2011.[80]

I find in favor of third-party defendant California Pension Administrators & Consultants, Inc. against defendants and third-party plaintiffs on Count One of their Amended Third Party Complaint, alleging that CalPac breached its Client Service Agreement with defendant R.L. Reppert, Inc.

Finally, I find in favor of third-party defendant CalPac against defendants and third-party plaintiffs on Count Two of their Amended Third Party Complaint, alleging that CalPac knowingly or recklessly misrepresented the plan administration and recordkeeping services they would provide to defendant R.L. Reppert, Inc.

---

[80]     All other parts of Count Four of plaintiff's Class Action Complaint were dismissed by my Order and Opinion dated February 4, 2016 and filed February 5, 2016 granting in part and denying in part both plaintiff's and defendants' cross-motions for summary judgment.